**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **RHONDA BILLUPS,** | : | |
| | : | **Case No. 2:13-CV-258** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Deavers** |
| **OFFICER KYLE SCHOLL,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

## <u>OPINION & ORDER</u>

This matter comes before the Court for consideration of Defendant JaQue Carter's

Motion for Summary Judgment.  (Doc. 46.)  For the reasons that follow, the Court **GRANTS in**

**part** and **DENIES in part** Defendant's Motion for Summary Judgment.

### I.     BACKGROUND

#### A.  Factual Background

At 6:50 p.m. on March 19, 2011, the Columbus Division of Police ("CDP") Dispatch

received a 911 call from a woman identified only as Maggie.  (Dispatch Report, Doc. 52-1, Ex.

A at 1.)  She reported four or five black females riding near East Mound Street and Linwood

Avenue in a gold car and stated that one of the women had a gun and was threatening Maggie's

son.  (*Id.*)  She told the dispatcher that she would be standing on the aforementioned corner when

the officers arrived.  (*Id.*)  One minute later, three patrol officers in two CDP vehicles were

dispatched to the scene and given the description of the car and its occupants.  (Affidavit of

Wendy Massey, Doc. 46-34 at ¶ 9.)  A minute after that, Officers JaQue Carter, Heath Gillespie,

1

and Frank Lemak[1] observed three black females in a four-door tan Pontiac Bonneville traveling westbound on East Fulton Street near the intersection of Wilson Avenue. (*Id.* at ¶ 10; Affidavit of JaQue Carter, Doc. 46-31 at ¶ 8; Affidavit of JaQue Carter, Doc. 46-33 at ¶ 6; Dispatch Report, Doc. 52-1, Ex. A at 1.) The Bonneville was owned by Billups' friend, Angela Burke. (Deposition of Rhonda Billups, Doc. 40 at 15.)

Officers Gillespie and Carter initiated a traffic stop of the Bonneville near the intersection of East Fulton Street and Linwood Avenue, approximately one block west and one block south of the intersection of East Mound Street and Linwood Avenue.[2] (Gillespie Aff., Doc. 46-33 at ¶ 6; Deposition of Rosemary Cole, Doc. 44 at 21; Billups Dep., Doc. 40 at 16.)

Billups was driving the car and her two passengers were Rosemary Cole, seated in the front seat, and a woman in the backseat known to Billups and Cole only as Mieka. (Billups Dep., Doc. 40 at 10-11, 12-14; Cole Dep., Doc. 44 at 18.) Officers Carter and Gillespie exited their vehicle with their guns drawn and one of the officers yelled "Put your hands up. Don't move."[3] (*Id.* at 22; Billups Dep., Doc. 40 at 17, 29-30; Gillespie Aff., Doc. 46-33 at ¶ 13.) Because they suspected that one of the car's occupants was armed, they treated the stop as a felony stop rather than a typical traffic stop. (Deposition of JaQue Carter, Doc. 42 at 9-10.) In a

---

[1] Billups and Cole both testified that there were three officers at the scene of the stop and the incident report reflected that three officers were present. Officers Carter and Gillespie could not recall whether another officer arrived on the scene after they did, although Officer Carter says he believe that Officer Lemak did arrive at some point to assist. (*See* Carter Aff., Doc. 46-31 at ¶ 37; Gillespie Aff., Doc. 46-33 at ¶¶ 12, 26.) Officer Lemak was not deposed in this case.

[2] The officers recalled that the stop occurred near the intersection of East Fulton Street and Wilson Avenue, which is one block from the intersection that Maggie identified. (Carter Aff., Doc. 46-31 at ¶¶ 10-11.)

[3] Officer Carter submitted an affidavit stating that he and Officer Gillespie did not have their guns drawn as they approached the car, but this testimony is contradicted not only by Billups, Cole, and Officer Gillespie but also by Officer Carter's own deposition testimony, in which he admitted he had his gun drawn. (Carter Aff., Doc. 46-31 at ¶ 21; Carter Dep., Doc. 42 at 9-10.)

felony stop, officers draw their guns on a car's occupants and one of them orders the person out of the vehicle.  (*Id.* at 9.)

Mieka began to scream in fear when the officers trained their guns on the three women. (Cole Dep., Doc. 44 at 22.)  Officer Carter, who was pointing his gun at Billups, told her to put her hands on the steering wheel.[4]  (*Id.*; Billups Dep., Doc. 40 at 30.)  Next, he "grabbed . . . Billups out of the car" in a manner that Cole described in her deposition as "n[o]t nice" and "really rude and nasty."  (Cole Dep., Doc. 44 at 22, 23-24.)  According to Billups and Cole, after Officer Carter pulled Billups out of the car while pointing his gun at her, he handcuffed her.  (*Id.* at 26, 32.)  Cole said that he "grabbed [Billups] up" and "shoved a little."  (*Id.* at 30.)  Both Cole and Billups acknowledged that Officer Carter did not "slam" her against the car but Cole said he pushed her against it.  (*Id.*; Billups Dep., Doc. 40 at 27.)  Billups, however, did not say that he pushed her against the car, and attested that the only instances of force against her during the incident were Officer Carter pulling her from the car and walking her to the sidewalk while holding onto her arms.  (*Id.*)  Billups specifically recalled that Officer Carter had "snatched" her out of the car, "yanked" her, and "was kind of rough" while they were walking onto the sidewalk.  (*Id.* at 25-26.)  After she was on the sidewalk, Officer Carter instructed Billups to get into the police cruiser, and Billups refused, explaining to Officer Carter that she had recently had surgery—a hysterectomy—which would prevent her from getting into the cruiser. (Cole Dep., Doc. 44 at 23, 33.)  Officer Carter persisted in ordering her to get in the vehicle but she continued to refuse.  (*Id.*)  Billups admitted that she did not tell Officer Carter about the surgery,

---

[4] Billups testified that the only black officer is the one who pointed his gun at her and pulled her out of the car.  (Billups Dep., Doc. 40 at 23.)  Carter is black and Lemak and Gillespie are white. Cole testified that all three officers at the scene were white (Cole Dep., Doc. 44 at 27) but Carter acknowledges that he was at the scene and the police report corroborates his presence.  (Dispatch Report, Doc. 52-1 at 1.)  Moreover, Carter admitted to being the officer who removed Billups from the car.  (Carter Dep., Doc. 42 at 27.)

or the stitches on her stomach, until after he had pulled her out of the car.  (Billups Dep., Doc. 40 at 25, 49.)  Officer Carter's gun was trained on Billups throughout the encounter.  (Cole Dep., Doc. 44 at 32.)  Because she repeatedly refused to get in the car, the officer left Billups on the sidewalk.  (Billups Dep., Doc. 40 at 17.)

In the meantime, Cole was telling Mieka to calm down.  (Cole Dep., Doc. 44 at 22.)  The other officers asked Cole and Mieka to get out of the car and, when they complied, handcuffed them.  (*Id.*; Billups Dep., Doc. 40 at 18, 24.)  Unlike Billups, the other two women were asked to get out of the Bonneville rather than pulled out.  (Cole Dep., Doc. 44 at 26.)  Cole and Billups both said the officers did not question them but the women repeatedly asked the officers why they had been pulled over and they received no answer.  (*Id.* at 23.)  The officers also told Cole and Mieka to get into one of the police cruisers.  (*Id.*)  Cole said she could not get into the cruiser because she was too big to get in.  (*Id.*; Billups Dep., Doc. 40 at 18.)  Mieka, still screaming, got into the cruiser as instructed.  (Cole Dep., Doc. 44 at 23.)

One of the officers asked Billups for her name, although he did not ask to see identification, then huddled with the other officers, returned to the cruiser, and released all three women.  (*Id.*; Billups Dep., Doc. 40 at 27-28.)  Billups stated that the officer did not ask for her name until "towards the end" of the encounter after she had been standing on the sidewalk for awhile.  (Billups Dep., Doc. 40 at 17.)  In her narrative of the incident, she did not indicate that she saw the officers search the Bonneville.  (*See id.* at 28.)

Carter stated that he never touched Billups when he instructed her to get out of the car and that the officers did not pat down the women but did search the car for weapons while the women were standing on the sidewalk, although he could not remember which officer conducted

the search.[5]  (Carter Dep., Doc. 42 at 27, 12, 14-15.)  Cole testified that the officers did not search the car.  (Cole Dep., Doc. 44 at 23.)  He testified that no officer had his gun trained on the women while they were on the sidewalk.  (Carter Dep., Doc. 42 at 12.)  The CDP's protocol for patting down female detainees is to summon a female officer to do the pat-down, although if a male officer feels threatened, he may pat down a female suspect himself.  (*Id.* at 13-14.)

In an affidavit, Officer Gillespie stated that he and Officer Carter approached the Bonneville with guns drawn, ordered all three occupants of the Bonneville to put their hands where the officers could see them, instructed them to exit the car, and then ordered them to stand on the sidewalk.  (*Id.* at ¶ 14.)  He recalled that neither he nor Carter ever handcuffed any of the women or placed them in a cruiser and that they felt no need to pat the women down because the women complied with their orders, wore clothing that was unlikely to conceal a weapon, and appeared to be over the age of 30.  (*Id.* at ¶¶ 19-20.)

At 6:59 p.m., less than seven minutes after they spotted the Bonneville and initiated the stop, the officers called into dispatch, indicated that they had made no arrests, and stated that they would contact Maggie.  (Massey Aff., Doc. 46-34 at ¶ 12.)  At 7:03 p.m., they called the dispatcher again to relay that the only additional information they had received from Maggie was that the suspect vehicle was a gold Impala.  (*Id.* at ¶ 15; Carter Aff., Doc. 46-31 at ¶ 38; Dispatch Report, Doc. 52-1 at 2.)

Billups had pain in her stomach as a result of the incident but did not seek medical treatment for any injuries.  (Billups Dep., Doc. 40 at 20, 49.)  She testified in her deposition that she experienced depression after the incident and that she still feels depressed and has

---

[5] Carter later recalled in his affidavit that he stood cover, meaning "kep[t] an eye on the Bonneville's occupants," while Officer Gillespie swept the Bonneville for weapons.  (Carter Aff., Doc. 46-31 at ¶ 24.)

nightmares about the gun being drawn on her, preventing her from sleeping.  (*Id.* at 18-20.)  She takes medication for her depression.  (*Id.* at 19.)  She also testified that her doctor had diagnosed her with post-traumatic stress disorder although submitted no medical records to that effect.  (*Id.* at 54.)

Four months after the incident, on July 18, 2011, Billups went to the CDP Internal Affairs Bureau ("IAB") to lodge a complaint about the incident.  (*Id.* at 30.)  Sergeant Jeff Podolski interviewed her and she recounted her story, specifically taking issue with Officer Carter's training his gun on her and refusing to tell her why she was stopped, but not mentioning that he handled her roughly when pulling her out of the car.  (*Id.* at 37.)  In response to a question from Sergeant Podolski about why she waited four months to go to the IAB, she responded that she had been recovering from her hysterectomy and was also not sure about the proper way to file a complaint.  (*Id.* at 37-38.)  She eventually heard from some people she knew that the first step in filing a complaint was to go to IAB, so she did.  (*Id.* at 38.)  Billups' brother is a CDP officer, which she told Sergeant Podolski that she had informed Officer Carter after he stopped her.  (*Id.* at 34.)  She did not ask her brother for assistance in contacting the CDP to file a complaint.  (*Id.* at 38.)  At the conclusion of the interview with Sergeant Podolski, he told Billups that the Internal Affairs Bureau would not conduct a "complaint investigation" because more than 60 days had elapsed since the incident and the officers' conduct was not criminal in nature.  (*Id.* at 39.)  Billups asked for a record of the stop and Sergeant Podolski told her where she could go to request that record, which she said she had previously been told she would not be able to obtain because she was not arrested.  (*Id.* at 40-42.)

At Sergeant Podolski's suggestion, Billups visited the Public Records Unit of CDP that same day. (Public Records Request, Doc. 46-1.)  She requested a patrol record for the March 19,

2011 traffic stop and wrote "Carter" under the space for "Investigative Detective/Unit" on the request form.  (*Id.*)  Although CDP Public Records Officer Amy Morris, who processed the request, did not find any responsive records in her first few searches because Billups' name did not appear on any reports, she eventually contacted Billups on the telephone to learn more details about the incident and was able to find a report on the stop.  (Affidavit of Amy Morris, Doc. 46-36 at ¶¶ 15-18.)  On August 2, 2011, Officer Morris notified Billups that the report was available, and Billups picked it up on August 17, 2011.  (*Id.* at ¶ 25; Public Records Invoice, Doc. 46-5.)  The Computer Aided Dispatch Report that CDP gave to Billups did not contain the names of any officers.  (Docs. 46-2; 46-3.)

On February 9, 2012, Billups submitted another request for documents to the Public Records Unit.  (Public Records Request, Doc. 46-6.)  This time, she requested a "[c]opy of printout from IAB."  (*Id.*)  The Public Records Unit made her IAB intake report available the next day and she picked it up four days later.  (Affidavit of Jo Anne Cunningham, Doc. 46-32 at ¶¶ 31-33; Doc. 46-7.)  It did not contain the names of any officers.  (*Id.*)

On August 22, 2012, Billups' attorney, W. Jeffrey Moore, sent a public records request to CDP requesting the following: "any information regarding Rhonda Billups, including all medical records, injury records, jail reports, etc.  Specifically any and all records regarding the stop on March 19, 2011 at approximately 7 p.m."  (Doc. 46-9.)  Records Technician William McPherson processed the request[6] but found no record responsive to the request and sent Moore a letter explaining as such.  (Doc. 46-10.)  Because the Bonneville did not belong to Billups and Billups was not arrested after the stop, he did not find any records with her name.  Moore did not follow

---

[6] Moore's letter was addressed to the CDP "Keeper of the Records," and was forwarded to McPherson in the Police Records Unit, a different department than the Public Records Unit. (Affidavit of William McPherson, Doc. 46-35 at ¶¶ 2, 6.)

up immediately with CDP after receiving McPherson's letter.  Eventually, Moore hired a private investigator, who submitted a records request on November 5, 2013 for the names of the officers and also spoke with Officer Morris, whom he knew personally. (Public Records Request, Doc. 52-1, Ex. F; Affidavit of W. Jeffrey Moore, Doc. 52-2 at ¶¶ 4-5.)  Billups also submitted her own request to CDP on that same day.  (Public Records Request, Doc. 52-1, Ex. G.)

### B.  Procedural History

Plaintiff filed a complaint against six John Doe Defendants on March 19, 2013.  (Doc. 1.)  After Plaintiff failed to effect timely service on Defendants, she asked the Court to grant her an extension of time to amend her complaint and effect service, explaining that she suffered from a mental illness that interfered with her ability to discover Defendants' identities.  (Doc. 4 at 1-2.)  The Court ordered Plaintiff to substitute the proper Defendants and effect service by November 18, 2013.  (Doc. 5 at 1-2.)   On November 14, 2013, Plaintiff filed her amended complaint against Officers Lemak, Carter, Gillespie, and Kyle Scholl.  (Doc. 6.)  Service was not complete until December 20, 2013.  (Doc. 8.)  Defendants filed a motion to dismiss the amended complaint for insufficient service and failure to state a claim upon which relief could be granted on statute-of-limitations grounds.  (Doc. 9.)

On September 29, 2014, the Court denied Defendants' motion to dismiss.  (Doc. 15.)  First, the Court found that Plaintiff showed good cause for why service was not made within the required time period under Federal Rule of Civil Procedure 4(m) because the CDP "practically played a shell game with Plaintiff when she diligently tried to" obtain the names of Defendants, which were "uniquely within CDP's control."  (*Id.* at 5-6.)  Second, the Court denied the motion to dismiss under Rule 12(b)(6).  (*Id.* at 9.)  Ohio Revised Code § 2305.10 requires a cause of action under 42 U.S.C. § 1983 to be brought within two years.  Although Plaintiff filed her

complaint less than two years after the incident giving rise to the claims, she did not name

Defendants until November 14, 2013, more than two years after the March 19, 2011 incident.  As

the Court explained in its order denying the motion to dismiss, the only exceptions to the two-

year filing requirement are: (1) when a claim relates back to the original filing date; and (2) when

the statute of limitations is equitably tolled.  (*Id.* at 6.)  The Court found that the claim against

Defendants did not relate back to the original complaint but that the statute of limitations should

be equitably tolled:

> Plaintiff argues that Defendants withheld public records and thus this Court should find
> that the statute of limitations tolled.  (Doc. 13 at 6.)  In fact, the CDP is in the unique
> position in that they alone had access to this information.  Plaintiff could not have
> discovered this information without disclosure from the CDP.  This situation is analogous
> to . . . *Spitsyn* and *Robertson* because Plaintiff did not have the ability to name the
> Officers without the cooperation of the CDP.  The situation is similar because the
> plaintiffs in those cases did not have the ability to pursue claims when their attorneys
> effectively prohibited them from doing so.  Furthermore, Plaintiff made three public
> record requests with the CDP for information relating to the incident between July 2011
> and August 2012.  (Doc. 13 at 4-5.)  These requests demonstrate that Plaintiff pursued her
> rights diligently.  Plaintiff is entitled to equitable tolling because the CDP did not provide
> the names of Officers to Plaintiff in a timely manner even though Plaintiff diligently
> pursued her rights.

(*Id.* at 9.)

The parties subsequently stipulated to the dismissal without prejudice of Defendants

Scholl, Lemak, and Gillespie, leaving Carter as the sole remaining Defendant.  (Doc. 25.)

During the course of discovery, a dispute arose over whether the Court had conclusively

decided the equitable-tolling issue at the motion-to-dismiss stage of litigation or whether

discovery was appropriate on this issue in order for Defendant to contest equitable tolling on

summary judgment.  Carter filed a motion to compel discovery and for leave to depose Billups'

counsel, W. Jeffrey Moore.  (Doc. 29.)  Billups opposed the motion and also moved for a

protective order asking the Court to prohibit discovery related to the untimeliness defense.

(Docs. 28, 30.)  In a March 10, 2015 Opinion and Order, the Magistrate Judge found that because the Court did not give notice under Federal Rule of Civil Procedure 12(d) that it was treating Defendants' motion to dismiss on the timeliness issue as one for summary judgment under Federal Rule of Civil Procedure 56, the Court had not foreclosed Defendant from pursuing his statute-of-limitations defense beyond the motion-to-dismiss stage of the litigation.  (Doc. 34 at 7.)  The Magistrate Judge denied Plaintiff's motion for a protective order, granted Defendant's motion to compel, and granted Defendant's request for leave to depose Moore, limited to the pre-litigation attempts Moore or anyone acting on his or Billups' behalf took to learn of the officers' identities.  (*Id.* at 11.)  The parties later stipulated that Plaintiff "and her representatives have alerted the defendant and/or his counsel to every attempt or action taken to find out who the officers involved in the traffic stop of Ms. Billups were."  (Doc. 46-28.)

Defendant Carter filed this motion for summary judgment.  (Doc. 46.)  He asserts that Plaintiff's claims are barred by the statute of limitations and, in the alternative, that he is entitled to qualified immunity on Plaintiff's constitutional claims.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law."  *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts."  *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 340 (6th Cir. 1993).  The mere possibility of a factual dispute is

insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992). Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### III.    ANALYSIS

### A.  Equitable Tolling

Ohio law requires that an action brought under 42 U.S.C. § 1983 be commenced within two years after "the plaintiff knows or has reason to know of the injury which is the basis of [her] action." *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005); *see* Ohio Rev. Code § 2305.10(A). The traffic stop occurred on March 19, 2011, so the appropriate filing deadline was March 19, 2013. Plaintiff filed her complaint on that date but did not name a defendant until November 14, 2013. Although the Court denied Defendant's motion to dismiss Plaintiff's complaint as barred by the statute of limitations in its September 29, 2014 order, the Court now considers this argument with the benefit of the developed factual record on summary judgment.

A plaintiff is entitled to equitable tolling of a statute of limitations "when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Lauderdale v. Wells Fargo Home Mortg.*, 552 F. App'x 556, 570 (6th Cir. 2014) (quoting *Graham-Humphreys v. Memphis Brooks Museum of Art, Inc.*, 209 F.3d 552, 560-61 (6th Cir. 2000)).  The party seeking equitable tolling, in this case Plaintiff, bears the burden to show she meets its requirements.  *Robertson v. Simpson*, 624 F.3d 781, 784 (6th Cir. 2010).  To do so, she must show "(1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way' and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).  In the absence of "compelling equitable considerations, a court should not extend limitations by even a single day." *Graham-Humphreys*, 209 F.3d at 561.  Equitable tolling "is a fact-intensive inquiry best left to the" trial court.  *Robertson*, 624 F.3d at 785-86.

Defendant argues that Plaintiff did not pursue her rights diligently and that no extraordinary circumstance prevented her from timely filing because she never specifically asked for the names of the involved officers.  (Doc. 46 at 27-29.)  Since her original request expressly identified "Carter," Defendant contends that it was reasonable for CDP to believe that she already knew the names of the involved officers.  (*Id.* at 27.)  Moreover, she never followed up after CDP produced information, indicating she did not find that information incomplete.  (*Id.* at 28.)  Defendant also notes that Billups could have asked her brother, a CDP officer, for assistance in the process, pursued pre-litigation discovery of the names under Ohio Revised Code § 2317.48 and Ohio Rule of Civil Procedure 34(D), or filed the complaint against "Officer Carter" and other Doe defendants.  (*Id.* at 29.)

Plaintiff responds that her mental-health issues prevented her from communicating effectively with her attorney.  (Doc. 52 at 8.)  She suggests that requests for "all records" pertaining to the stop would reasonably include the names of the officers who conducted the stop.  (*Id.*)  Finally, she insists that CDP "purposely" hid the names of Defendant and other officers.  (*Id.* at 13-14.)

There is no evidence that Defendant redacted the names of any officers or purposely hid the names to avoid litigation.  And the fact that Billups wrote Defendant Carter's last name on her first request might suggest that she already knew his full name.  But Plaintiff made several records requests and diligently followed up to obtain them.  She even continued to do so after one of her requests yielded no response after it was directed to the Police Records Unit, which apparently does not communicate with the Public Records Unit that had already processed a previous request from Billups.  (*See* McPherson Aff., Doc. 46-35; Morris Aff., Doc. 46-36.) Although the records were neither detailed nor specific, the Court finds that a reasonable jury could believe that she had exercised due diligence, particularly because she was dealing with mental-health challenges during this period and may have lacked a sophisticated understanding of how to file a records request.

Although Defendant makes much of the fact that the cases on which Plaintiff relies to support her argument for equitable tolling present egregious instances of attorney misconduct that distinguish them from this case, the Court finds that these cases stand for the proposition that equitable tolling is appropriate when the plaintiffs did not have the ability to obtain information vital to their claims.  *See Robertson*, 624 F.3d at 786; *Spitsyn v. Moore*, 345 F.3d 796, 802 (9th Cir. 2003).  Here, too, construing the evidence in her favor, Plaintiff could not obtain the names of the officers without CDP providing them, and she attempted several times to do so.

Moreover, even though there is no evidence that CDP purposely withheld the officers' names, there is evidence in the record that CDP staff knew that Billups was considering litigation against the officers, and that, at the very least, Officer Morris knew Officer Carter's name because she contacted him when responding to the request.  (*See* Morris Aff., Doc. 46-36 at ¶¶ 18, 20, 31.) Given that CDP is presumably quite familiar with requests for record relating to possible litigation because such litigation is not infrequent, it would be reasonable for a jury to conclude that CDP records technicians would include the names of officers in a request for records relating to a police encounter.  A jury could also find that it is unreasonable for none of the many CDP officials Billups contacted to have explained to her that her name would not have appeared in the traffic stop record because she was not arrested and did not own the Bonneville.  Such an explanation could have enabled her to target her search more precisely in future requests and timely file her lawsuit.

Because only CDP had access to the information regarding the names of the officers who conducted the stop and Billups repeatedly attempted to obtain information related to the stop, the Court finds that there is a genuine issue of material fact regarding whether the two-year statute of limitations should be equitably tolled.  Therefore, summary judgment on this basis is not appropriate and the Court proceeds to consider the merits of Plaintiff's constitutional claims.

### B.  Qualified Immunity

Plaintiff brings a cause of action under 42 § U.S.C. § 1983 for violations of her Fourth, Fifth, Eighth, and Fourteenth Amendment rights.  Before delving into the merits of the parties' arguments, the Court will dismiss three of these claims as non-cognizable on their face.  First, the Fifth Amendment applies only to federal actors and not state actors like Officer Carter.  *See Scott v. Clay Cnty., Tenn.*, 205 F.3d 867, 873 n.8 (6th Cir. 2000).  The Eighth Amendment

14

applies only to post-conviction inmates.  *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008).  Finally, the Fourteenth Amendment protects pretrial detainees from the use of excessive force, but it does not apply to claims arising from an arrest.  *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010).  Rather, the Fourth Amendment governs a claim of excessive force that "occurred in the course of an arrest or other seizure of the plaintiff," as well as other claims arising from a stop.  *Id.*  Plaintiff does not oppose the dismissal of her Fifth, Eighth, and Fourteenth Amendment claims.  The Court **GRANTS** summary judgment to Defendant on these three claims and now turns to Plaintiff's Fourth Amendment claim.

### 1. Legal Standard

To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed in his favor, demonstrate the deprivation of a right secured by the Constitution or laws of the United States caused by a person acting under the color of state law.  *Sigley v. City of Parma Heights,* 437 F.3d 527, 533 (6th Cir. 2006).  The qualified-immunity doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The plaintiff bears the burden to show that a defendant is not entitled to qualified immunity.  *O'Malley v. City of Flint*, 652 F.3d 662, 667 (6th Cir. 2011).

In considering a qualified-immunity defense, the Court considers first whether the facts viewed in the light most favorable to Plaintiff show that Officer Carter violated her constitutional rights.  *Id.* at 232.  Second, the Court determines whether the right in question was clearly established at the time of the violation, that is, whether "the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates the right."

*Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (internal quotation marks, citation, and alterations omitted).  The Court may conduct the address the two prongs of the qualified-immunity analysis in either order.  *Pearson*, 555 U.S. at 236.

Plaintiff alleges both excessive-force and unlawful-seizure claims against Officer Carter. The Court will consider each in turn.

*2. Unlawful Seizure*

a. Constitutional Violation

The Fourth Amendment prohibits unreasonable seizures, including "brief investigatory stops of persons or vehicles that fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  A brief investigatory stop, such as a traffic stop, does not run afoul of the Fourth Amendment, however, when a law enforcement officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).  The standard for determining whether the officer had reasonable suspicion to conduct the stop "takes into account 'the totality of the circumstances— the whole picture.'"  *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (quoting *Cortez*, 449 U.S. at 417).  To establish reasonable suspicion, the government must be "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion as measured by an objective standard."  *United States v. Vite-Espinoza*, 342 F.3d 462, 466 (6th Cir. 2003) (quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968)).  Reasonable suspicion need not be based only "on the officer's personal observation" but may also take into account "information supplied by another person."  *Navarette*, 134 S. Ct. at 1688 (quoting *Adams v. Williams*, 407 U.S. 143, 147 (1972)).  Reasonable suspicion is more than a

mere "hunch," *see Terry*, 392 U.S. at 27, but less than probable cause, *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006).

Billups contests the reasonableness of the stop because the color of the Bonneville and its number of occupants did not match the information the dispatcher gave the officers. (Doc. 52 at 11.) The Court finds that the officers had reasonable suspicion to stop the Bonneville. The occupants of both cars were black females, even though the car described by Maggie carried four or five women while Billups' car contained only three. The officers spotted the car a mere two or three minutes after the call and only a block or two from where Maggie had pinpointed its location. Although the officers later found out from Maggie that the car was an Impala, at the time of the stop they only knew it was "gold," and gold and tan are similar colors, as Billups herself even conceded. (Billups Dep., Doc. 40 at 45-46 ("Some people say it's gold; some people say it's tan. . . . [I]t's about the same color.").)

Although not a perfect match, the Sixth Circuit has held that a stop is not unreasonable if based on "a minor difference in reported color (*silver v. 'tannish'*)" when the stop is "supported by other physical similarities, as well as temporal and physical proximity to the reported crime." *United States v. Atkins*, 513 F. App'x 577, 580 (6th Cir. 2013). *See also United States v. Hurst*, 228 F.3d 751, 756-57 (6th Cir. 2000) (holding that a stop of a dark-blue Mercury Cougar with three passengers was reasonable based upon a report of a dark-colored Ford Thunderbird with two passengers fleeing the scene of a burglary, because of the car's physical and temporal proximity to the crime and the similarity of other physical features); *United States v. Babb*, 77 F. App'x 761, 766 (6th Cir. 2003) (holding that a discrepancy between a report indicating a vehicle with two persons and a stop of a vehicle holding only a driver "does not defeat the assessment of reasonable suspicion" based on the totality of circumstances); *United States v. Nance*, No. 3:09-

17

cr-163, 2010 WL 4004782, at *10 (E.D. Tenn. Sept. 17, 2010) ("An investigatory stop may be reasonable even if the vehicle does not perfectly match the description provided in a BOLO report.").

Because the Court finds no constitutional violation when Officer Carter stopped the Bonneville, the Court need not determine whether any constitutional right was clearly established, although the Sixth Circuit decisions in *Atkins*, *Hurst*, and *Babb* suggest that there is no clearly established right only to be stopped under *Terry* if a dispatcher's physical description of a car and passengers is an exact match for the car and passengers stopped.  The Court **GRANTS** Defendant's motion for summary judgment on Plaintiff's unreasonable-seizure claim.

*3. Excessive Force*

a. Constitutional Violation

Plaintiff argues that Officer Carter violated her constitutional right to be free from excessive force when he pulled her out of the car by both arms, roughly pushed her to the sidewalk while pointing his weapon at her, and handcuffed her during the approximately seven-minute stop.

Claims of excessive force are analyzed under the Fourth Amendment's "reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  The reasonableness of a challenged application of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Id.* at 396.  The pertinent question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397.  The Court must "carefully balance 'the nature and quality of the intrusion on the individuals' Fourth Amendment interests against the countervailing governmental interests at stake.'"  *Kent v.*

*Oakland Cnty.*, 801 F.3d 384, 390 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at 396).  Relevant

factors to consider in evaluating the reasonableness of the force used include: "the relationship

between the need for the use of force and the amount of force used; the extent of the plaintiff's

injury; any effort made by the officer to temper or to limit the amount of force; the severity of

the security problem at issue; the threat reasonably perceived by the officer; and whether the

plaintiff was actively resisting."  *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (citing

*Graham*, 490 U.S. at 396).

The Sixth Circuit has held that "[d]uring a *Terry* stop, officers may draw their weapons or

use handcuffs 'so long as circumstances warrant that precaution.'"  *Radvansky v. City of Olmsted*

*Falls*, 395 F.3d 291, 309 (6th Cir. 2005) (quoting *Houston v. Clark Cnty. Sheriff Deputy John*

*Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999)).  It is clear that "when police officers reasonably

fear that suspects are armed and dangerous, they may order the suspects out of a car and may

draw their weapons when those steps are 'reasonably necessary for the protection of the

officers.'"  *Houston*, 174 F.3d at 814-15 (quoting *United States v. Garza*, 10 F.3d 1241, 1246

(6th Cir. 1993)).  *See also United States v. Hardnett*, 804 F.2d 353, 357 (6th Cir. 1986)

(upholding as reasonable officers' stop of a car with weapons drawn when the officers

reasonably believed that its occupants were armed); *Garza*, 10 F.3d at 1244, 1246 (holding that it

was reasonable for officers to order the plaintiff out of his truck at gunpoint, handcuff him, and

place him in a police cruiser when the police believed that he was armed and dangerous and the

plaintiff was in a semi-truck, making it impossible for the officers to see the plaintiff inside the

elevated cab of the truck).

Similarly, an officer who reasonably believes that a suspect may be armed does not violate the Fourth Amendment by using handcuffs during an investigative stop.[7] *See Hurst*, 228 F.3d at 758 n.3 ("[U]nder the circumstances, where defendant was reasonably suspected of having just burglarized a home and might reasonably have been deemed armed and dangerous, the officers' attempt to use handcuffs as a precautionary measure to secure their safety during the vehicle search was not unreasonable or otherwise improper."); *Radvansky*, 395 F.3d at 309 (holding that officers were justified in briefly detaining suspect with handcuffs when there was evidence of forced entry of a residence); *Garza*, 10 F.3d at 1246.  The Court finds that the officers' drawing of their weapons and use of handcuffs, standing alone, did not constitute excessive force.

Officer Carter's force against Plaintiff when he pulled her from the car by both arms and roughly pushed her onto the sidewalk is another matter, however.  The Supreme Court has said that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment.  *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  But the Fourth Amendment "only permits an officer to use reasonable force to protect himself from a reasonable threat."  *Aldini*, 609 F.3d at 867. The remaining question before the Court, then, is whether Officer Carter's rough treatment of Billups (in her version of events, which the Court credits for purposes of summary judgment) violated her Fourth Amendment rights and, if so, whether this right was clearly established at the time of the incident.

---

[7] Officers Carter and Gillespie both recall that they did not handcuff any of the three occupants of the Bonneville but merely ordered them to stand on the sidewalk as Gillespie searched the car and Carter stood guard.  On summary judgment, however, as Defendant's counsel conceded at oral argument, the Court is required to credit Plaintiff's version of events, which, here, is also corroborated by Cole's testimony.  Moreover, Officer Carter's account of the search of the car is internally inconsistent, as discussed *infra*.

Evaluating the factors articulated in *Kingsley* and *Graham*, the Court concludes that Billups' version of events shows that Officer Carter violated her constitutional right to be free from excessive force because the physical force he used when pulling her out of the car was unreasonable in light of the nature of the potential threat to him.  Although Plaintiff did not have significant physical injuries, she did testify that she had pain in her stomach after the incident, and she also suffered from depression after the stop.[8]  (Billups Dep., Doc. 40 at 18-20.)  *See Bolden v. City of Euclid*, 595 F. App'x 464, 471 (6th Cir. 2014) (noting that the "extent of the injury inflicted" is not "crucial to an analysis of a claim of excessive force," but the absence of injury to the plaintiff supports the conclusion that the force was not unreasonable) (quoting *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 407 (6th Cir. 2009)).  Neither officer alleges that Billups resisted complying with his orders, *see Kingsley*, 135 S. Ct. at 2473, and this mitigates in favor of a finding that grabbing her out of the car with both arms and shoving her onto the sidewalk was not a proportional response to Plaintiff's conduct.  Moreover, it is undisputed by either officer and by Cole and Billups that Officers Gillespie and Lemak did not roughly handle Cole or Mieka but merely instructed them to get out of the car.  Given that the officers had no reason to believe that the two passengers were less likely to be armed than Billups, a jury could certainly find that Officer Carter's use of force against Billups was greater than the amount of force necessary in this situation.

---

[8] Although Billups makes much of the fact in her response in opposition to Defendant's summary-judgment motion that she had told Officer Carter that she had stitches from a hysterectomy, she acknowledged in her deposition that she did not tell him about the surgery until after he had removed her from the car and walked her in a rough manner onto the sidewalk. (Billups Dep., Doc. 40 at 25-27, 49 ("Q: And the first time you told the officer about the hysterectomy is when—after he put  you on the sidewalk? A: Right, yes.  Q: All right.  And he didn't use any force against you after that—  A: No.").)  Therefore, the Court concludes that a reasonable officer would not have known about the surgery during the application of the force in question and so does not factor Billups' condition into its reasonableness analysis.

Finally, although Defendant argues that the "severity of the security problem at issue" and "the threat reasonably perceived by the officer" militate in favor of a finding that the force was reasonable here, *Kingsley*, 135 S. Ct. at 2473, the Court finds that the officers' behavior does not indicate that Officer Carter had a reasonable fear for his safety that justified roughly pulling Billups out of the car and shoving her onto the sidewalk.  First, as noted above, they did not pull Cole or Mieka out of the car despite having no less reason to believe they, as opposed to Billups, were armed.  Second, there is inconsistent testimony in the record—which on summary judgment must be construed in Plaintiff's favor—as to whether the officers searched the car.[9] Crediting Plaintiff's account that they did not search the car, nor did they ask for Billups' driver's license or other identification or pat down the women, there is no evidence that the officers had a reasonable fear for their safety.  Indeed, neither officer disputed that Billups and the other women were fully compliant with their orders, including the order to Billups to put her hands on the steering wheel so the officers could see them.  Under these circumstances, once the officers had stopped the car and approached the women, the Court cannot say that the officers had a reasonable fear for their safety that justified rough treatment of Billups in removing her from the car.  It strains the Court's credulity that a reasonable officer who feared for his safety would find it necessary to pull a suspect out of a car roughly and shove her but fail to question her, ask for her identification, pat her down, or search her car.

The Court's conclusion that Plaintiff's version of the facts shows a constitutional violation is consistent with Sixth Circuit case law that the physical removal of a suspect from the

---

[9] Officer Carter first testified in his deposition that he could not remember who searched the car but he thought that one of the officers on the scene did so.  He later recalled in his affidavit that Officer Gillespie searched the car while he stood cover.  Neither Cole nor Billups testified that any officers searched the car.

car is reasonable precisely *because* a plaintiff *does not comply* with officer commands.  For instance, in *United States v. Jackson*, the Sixth Circuit stated:

> Here, on the side of a highway, at nearly 2:00 AM, suspecting that Jackson was intoxicated, unable to ascertain as to why Jackson was reaching into the center console, and *after* multiple attempts to ask him out of the car went unheeded, the facts give rise to an inference that Jackson posed a reasonable threat. Unable to see what Jackson was doing, Trooper Kane could have reasonably suspected that Jackson was reaching for a weapon. This, along with the low level of intrusion—Jackson was not slammed to the ground or otherwise injured—supports a conclusion that Trooper Kane's actions were reasonable under the circumstances.

573 F. App'x 401, 405 (6th Cir. 2014).  In *Slusher v. Carson*, the Sixth Circuit found that an officer did not act unreasonably when he pulled down a plaintiff's arm and grabbed her hand because she was arguing with an officer and refusing to return a court order that the officer had shown her that entitled him to search her property and claim two tractors therein.  540 F.3d 449, 455-56 (6th Cir. 2008).  As the Sixth Circuit said in *Slusher*, "[i]n determining whether force was excessive, we often must assess the actions of the plaintiff."  *Id.* at 456.  Here, there is absolutely no evidence that Billups failed to comply promptly with any of Carson's orders, made any suspicious movements, or behaved in any manner that would necessitate force in removing her from the car.

Construed in Plaintiff's favor, the record indicates that Officer Carter violated Billups' constitutional right to be free from excessive force when he roughly pulled her from the car with his gun pointed at her when she was not resisting.

### b. Clearly Established

Having found a violation of Billups' constitutional right to be free from excessive force, the Court must now decide whether this right was clearly established at the time of the incident. In *Eldridge v. City of Warren*, the Sixth Circuit held that "the right of a suspect to be free from the use of physical force when he is not resisting police efforts to apprehend him" is clearly

23

established.  533 F. App'x 529, 535 (6th Cir. 2013).  Acknowledging that the Supreme Court has held that in the qualified-immunity context, rights should not be defined "at a high level of generality," *id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)), the *Eldridge* court relied on a previous Sixth Circuit case, *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012), that held that it was excessive to use gratuitous force on "suspects [who] were compliant or had stopped resisting," *Eldridge*, 533 F. App'x at 535 (quoting *Hagans*, 695 F.3d at 509), concluding that such a right was "sufficiently narrow[ed] . . . to achieve an adequate level of particularity," *id.*  The *Eldridge* court held that this right was clearly established at the time of the incident in question in that case, which took place in 2009, well before the 2011 stop of Billups and her passengers.  *See id.*

The Sixth Circuit has also held in numerous other cases that various kinds of force against a detainee were unreasonable because the detainee was fully compliant with officer instructions.  *See, e.g.*, *Burgess v. Fischer*, 735 F.3d 462, 474-75 (6th Cir. 2013) (use of force against a suspect was unreasonable when plaintiff was already handcuffed and compliant with orders); *Grawey v. Drury*, 567 F.3d 302, 310-11 (6th Cir. 2009) (finding that the use of pepper spray on an individual who had his hands up and was not resisting was unreasonable); *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) ("There is no governmental interest in continuing to beat [the plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was."); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) ("Everyone agrees that [the plaintiff] was handcuffed and that he was not trying to escape or to hurt anyone.  The 'need for the application of force' was thus nonexistent.").  Indeed, "[t]he general consensus among [Sixth Circuit] cases is that officers cannot use force . . . on a detainee who has been subdued, is not told he is under arrest, or is not resisting arrest."  *Grawey*, 567 F.3d at 314.  And at an even

greater level of particularity to the facts here, where Billups had her hands on the steering wheel, the Sixth Circuit has also noted that "an individual poses little threat of harm when her hands are in the air indicating submission." *Kent*, 810 F.3d at 391 (citing *Grawey*, 567 F.3d at 311).[10]

The Court finds that construing the record in Billups' favor as required on summary judgment, Officer Carter violated Billups' clearly established constitutional right to be free from excessive force. Because Billups was not a threat when Defendant Carter applied force, "[t]he need for the application of force was thus nonexistent." *McDowell*, 863 F.2d at 1307 (internal quotation marks omitted). Defendant's Motion for Summary Judgment on Plaintiff's excessive-force claim is **DENIED**.

### C. Official-Capacity Claim

Billups purports to bring claims against Officer Carter in both his individual and official capacities. Because official-capacity suits are "treated as a suit against the entity," *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (citing *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985)), the Court will construe this claim as a claim against the City of Columbus. Dismissal of this claim is warranted because Billups has failed to allege in her pleading that the constitutional violations were caused by a city "policy or custom." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Absent such a policy or custom, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Id.* The Court **GRANTS** summary judgment to Defendant on this claim.

---

[10] Although *Kent* was issued well after the 2011 stop of Billups, the Sixth Circuit in *Kent* cited *Grawey*, a 2009 case, for the proposition that it was a clearly established constitutional violation to use force on a plaintiff after he had stopped running and was "wait[ing] for police with his hands against a wall." *See Grawey*, 567 F.3d at 314.

## IV.    CONCLUSION

For the foregoing reasons, the Courts find that there is a disputed issue of material fact regarding whether the statute of limitations for Plaintiff's claims should be equitably tolled.  The Court **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's Fourth Amendment claim for unreasonable seizure; **DENIES** the Motion for Summary Judgment on Plaintiff's Fourth Amendment claim for excessive force on the ground that Carter is not entitled to qualified immunity; and **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's official-capacity claim, her Fourth Amendment claim for unlawful seizure, and her Fifth, Eighth, and Fourteenth Amendment claims.  (Doc. 46.)

**IT IS SO ORDERED.**


            ___s/ Algenon L. Marbley_____
            **ALGENON L. MARBLEY**
            **UNITED STATES DISTRICT JUDGE**

**DATED:  July 22, 2016**